Timothy C. NUTTER, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 4:02–CV–90571.

United States District Court,
S.D. Iowa,
Central Division.

July 11, 2003.

Plaintiff's attorney is: Kenneth A. Johnson, Esq., Des Moines.

Defendant's attorney is Gary L. Hayward, Esq., Assistant United States Attorney, Des Moines.

## ORDER

PRATT, District Judge.

Plaintiff, Timothy C. Nutter, filed a Complaint in this Court on October 29, 2002, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability benefits and Supplemental Security Income benefits on February 8, 2000. Tr. at 436–38 & 744–47. Plaintiff claimed to have become disabled December 17, 1999. Tr. at 436108. Plaintiff is insured for Title II benefits through December of 2000. Tr. at 448. Plaintiff had made applications for benefits in November of 1997 (Tr. at 149–51) in which he claimed an onset of disability of October 30, 1997. Tr. at 149. The 1997 application was denied initially and on reconsideration after which Plaintiff requested a hearing. Plaintiff appeared at a hearing in front of Administrative Law Judge Andrew T. Palestini on March 12, 1999 (the transcript of

the hearing does not appear in the record before the Court), and Judge Palestini issued a Notice Of Decision—Unfavorable on December 15, 1999. Tr. at 43–72.

After the February 2000 application was denied initially and on reconsideration, Plaintiff requested a hearing which was held before Administrative Law Judge John E. Sandbothe on December 20, 2001. Tr. at 82–127. Judge Sandbothe noted that on his new applications Plaintiff's alleged a different onset date than on the first application—after Judge Palestini had issued his decision—and that the principles of *Res Judicata* prohibited reconsideration of the first decision. Furthermore, this Court is without jurisdiction in that regard. *Califano v. Sanders*, 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977). Judge Sandbothe (ALJ) issued a Notice Of Decision—Unfavorable on May 24, 2002. Tr. at 14–29. After the decision was affirmed by the Appeals Council on August 29, 2002, (Tr. at 10–11), Plaintiff filed a Complaint in this Court on October 29, 2002.

## MEDICAL RECORDS

On October 29, 1997, Plaintiff was admitted to Mercy Hospital Medical Center in Des Moines, Iowa, after he had been found in a parking lot having fallen from his bicycle. Plaintiff was unconscious when he arrived at the emergency room of the hospital. A computerized axial tomography of the brain showed nothing acute. "A repeat computerized axial tomography scan on October 31, 1997, showed a small 8 mm localized hemorrhage/contusion of the left frontal lobe. There was a tiny amount of blood in the occipital horn of the right ventricle without evidence of hydrocephalus." Plaintiff had no response to verbal stimuli and inconsistent response to noxious stimuli. On November 1, 1997, there was still no response to verbal stimuli, but on November 2, 1997, Plaintiff was alert and hungry. Tr. at 206. On November 2,

1997, Plaintiff was transferred to the University of Iowa Hospitals and Clinics. Tr. at 207.

Plaintiff was admitted to the hospital at the University of Iowa on November 2, 1997, and transferred to the Department of Medicine on November 5, 1997. On November 23, 1997, Plaintiff was discharged against medical advice with diagnoses of organic personality disorder due to left frontal lobe contusion and methamphetamine abuse. In a letter dated November 24, 1997, to David G. Stilley, M.D. at Mercy Hospital, written by Howard Knapp, M.D. and Susan Schultz, M.D., it is stated that Plaintiff, who was 32 years old at the time, had a long history of substance abuse. Plaintiff had completed the 10th grade at which time he started using drugs. Plaintiff's last job had been with a moving company, but he had lost his driver's license due to driving while intoxicated. Plaintiff's family history was significant in that he had been adopted and that his biological father was an alcoholic. On physical examination, Plaintiff was described as a well-developed, well-nourished, young white male who was difficult to awaken from sleep. Plaintiff's forearms showed scattered small ulcerations which were thought to be infected skin abscesses. Mental status examination revealed orientation to name only. Tr. at 222. Under the heading "Hospital course," the following is written:

> Mr. Nutter was admitted to 4SE for further management of extreme agitation and delirium as the consequences of post traumatic organic brain damage. His urine drug screen in Des Moines was positive for methamphetamines so probably during the first part of this hospital stay he underwent withdrawal. He required high doses of Haldol and Ativan to keep him calm. Later Thorazine was started in increasing dose. During his hospital stay he demonstrat-

ed a remarkable recovery from his initial unresponsive agitated delirious state to be a responsible, close to normal person. He had lots of trouble with double vision, for which he was evaluated by Ophthalmology who recommended glasses to correct his mild nearsightedness, but noted a palsy of his right fourth cranial nerve. He did well on physical therapy. By the end of this hospital stay he was able to move around without endangering himself. His dilantin was discontinued after three weeks. There was no seizure after stopping the medications. Then Thorazine was tapered off. He had moderate left sided weakness but initial CT scans did not show any organic basis for this. He declined to have an MRI scan on November 11th. He underwent neuro-psych testing which showed good reasoning but very poor memory. By OT evaluation he had an Allen Test score of 5 which is consistent with being safe at home. He was waiting for boarding for placement where he could continue his PT and OT but before he could be transferred, he decided to leave the hospital even though he understood that he did it against medical advice. On the evening of November 23 his friend, Tony, came to pick him up and took him home to his appointment (sic). VNA will be assigned for him latter. A social worker is arranging plans for him for long term rehab.

Tr. at 223.

Plaintiff was seen for an eye examination by Diane E. Boone, M.D. at the University on November 19, 1997. Plaintiff reported double vision. Dr. Boone wrote that with appropriate prescription glasses, Plaintiff's vision was corrected to near normal. The Doctor wrote: "He does have a

right hypertropia[1] and with our best measurements looks as though it is stepping out to a right 4th nerve palsy, which would not be uncommon following trauma." The doctor went on to note, however, that it was difficult to get Plaintiff to cooperate with the examination and that they often got fluctuating measurements. The doctor did not recommend prism lenses until after a follow up examination three months later. Tr. at 566.

Plaintiff was seen for a consultative psychological examination by Phillip L. Ascheman, Ph.D. on February 11, 1998. Tr. at 247–50. Dr. Ascheman wrote: "He (Plaintiff) showed a normal pace and gait while proceeding to my office but upon his arrival he showed a wide, exaggerated gait and unusual foot movements including ankle flexing and twisting. The wide gait was again displayed at the conclusion of the interview but it was absent as he proceeded from my office to his vehicle." Plaintiff reported difficulty focusing his eyes, and inconsistently held one eye closed with his hand. Plaintiff was also inconsistent in his willingness to provide Dr. Ascheman with information during the clinical interview. Tr. at 247. On the Wechsler Adult Intelligence Scale—Revised, Plaintiff scored a verbal IQ of 92, a performance IQ of 87, and a full scale IQ of 88. Dr. Ascheman observed inconsistent effort during the testing and opined that the scores, which fell in the average to low average range, were an underestimation of Plaintiff's true level of intellectual functioning. Despite Plaintiff's complaint of poor memory, he was quite adept at recalling digit sequences on the digit span subtest. A brief mental status test showed intact orientation to all spheres with no evidence of short term memory, attention, concentra-

---

**1.** An ocular deviation with one eye higher than the other. Stedman's Medical Dictionary, 27th Edition.

tion, language, or visual spatial integration dysfunction. Dr. Ascheman opined that the examination did not suggest evidence for any specific emotional or cognitive disorder and that Plaintiff's level of intellectual functioning was adequate for seeking and maintaining productive employment. Tr. at 249.

Plaintiff was seen for a physical examination by Justin L. Ban, M.D. on April 2, 1998. Tr. at 263–67. After a review of the medical records provide to him, and a physical examination, Dr. Ban made the following diagnoses: Status post closed head injury; left frontal lobe contusion, resolved; persistent diplopia [2] secondary to right fourth nerve injury or loss of normal vestibular-ocular reflex; mild residual weakness in left upper and lower extremity as sequella to head injury; history of polysubstance abuse; probable antisocial personality disorder. Thereafter, the doctor wrote:

> The examinee's ability to lift and carry would be 40–50 lbs occasionally, 30–40 lbs frequently and 20–30 lbs constantly. The examinee's ability to stand, move about, walk and sit in an 8 hour day is unrestricted. Occasional stooping, climbing, kneeling and crawling would be tolerated. The conditions indicated above would preclude him from performing these latter activities on a repetitive basis. The examinee's ability to hear and speak is unrestricted. Seeing and traveling is restricted by the diplopia present. Likewise his ability to handle objects with the left hand is restricted by his loss of power and loss of dexterity in his left hand. He has no restrictions in terms of his ability to handle objects with the right hand and right upper extremity. The examinee is tolerant to the work environment in terms of dust, fumes, temperature, hazards, etc. within

the limits of the conditions mentioned above.

Tr. at 267.

Plaintiff was seen by Kenneth A. Follett, M.D., Ph.D. associate professor of neurosurgery at the University of Iowa on May 13, 1998. Plaintiff complained of chronic mild diplopia, sometimes worse with prolonged reading, some trouble with short-term memory, difficulty with some clumsiness on the left side of the body and occasional numbness over the left side of the jaw. The doctor noted that ophthalmologists had made Plaintiff a set of prism lenses for his glasses to treat his double vision. Dr. Follett could not detect any frank diplopia. The doctor wrote: "He squints when he looks up and to the right on occasion. Facial strength is full. Sensation is intact in the face. Auditory acuity is normal bilaterally. Strength is full in the extremities. Sensation is intact. Stance and gait are normal. His speech is clear and appropriate. His memory seems good. We obtained a head CT scan to rule out any late sequelae of his head injury, and I see no intracranial pathology." The doctor reassured Plaintiff that some of his problems would continue to improve over the next 6 months or so. Tr. at 281. The report of the CT scan to which Dr. Follett referred states that the small focal cortical contusion in the left frontal lobe was no longer evident. Tr. at 284.

On June 18, 1998, Plaintiff was seen at Broadlawns Medical Center for an intake interview by clinical social worker Eugene P. Krauss. Plaintiff told Mr. Krauss that he had fractured his skull at the time of the bicycle accident. Plaintiff was living at a homeless shelter, and reported that he was unable to meet his child support obligations because of his inability to work. Plaintiff said that he was the father of

---

**2.** The condition in which a single object is perceived as two objects. SYN: double vi-sion. Stedman's Medical Dictionary, 27th Edition.

three children by three different women, none of whom he had married. Plaintiff walked with an unsteady gait and had a patch over his right eye. Plaintiff's attitude was cooperative but the information given was somewhat disjointed. His mood and affect were anxious. His memory seemed to be intact and his intelligence was estimated to be average. Mr. Krauss wrote that Plaintiff had no support system and needed someone to talk to. He wrote that Plaintiff seemed confused and easily frustrated. Tr. at 326. Mr. Krauss diagnosed depressive disorder, and he scheduled a psychiatric evaluation to clarify the diagnosis. Tr. at 327.

Plaintiff was seen for a psychological evaluation by Rhonda Lovell, Ph.D. on July 28, 1998. Tr. at 291–95. Dr. Lovell was asked to review the medical records, make a mental status examination, and conduct a clinical interview. In addition, a validity indicator profile was administered. Plaintiff was observed to walk with an exaggerated, wide, uneven and slow gait. He weaved back and forth upon rising from a chair. His mood and affect were angry, and he refused to answer some questions. It was the doctor's opinion that Plaintiff did not put forth consistent effort during formal testing. Tr. at 291. Plaintiff reported that he last drank "one or two beers a week ago and would be drinking more heavily if he could. He last drank heavily a couple of months ago. He also used marijuana a week ago but denied use of other recreational drugs since the accident when he used methamphetamine." Tr. at 294. On testing of his memory, the psychologist opined that Plaintiff did not exert maximal effort so the results did not reflect his current memory functioning. In an effort to determine whether his responses were accurate estimates of his ability, a validity indicator profile was administered. This test produced invalid scores which could indicate careless responding resulting from fatigue, apathy or

a deliberate attempt to perform poorly. Dr. Lovell wrote that Plaintiff had a long history of substance abuse with current use of alcohol, prescription drugs and recreational drugs likely. "Mood is angry and antisocial personality traits are present." Under the heading of Diagnostic impressions, the psychologist wrote that Plaintiff probably meets the criteria for polysubstance dependence and antisocial personality disorder. Dr. Lovell opined that Plaintiff had the ability to understand and remember instructions, locations and procedures for basic, detailed and some complex tasks. His ability to carry out those tasks, however, would be reduced by his abuse of substances. The personality disorder, according to Dr. Lovell, would interfere with Plaintiff's ability to interact with supervisors, coworkers and the public. Tr. at 295.

Plaintiff saw neurologist Steven R. Adelman, D.O. on August 14, 1998, for an evaluation. Tr. at 296–98. Dr. Adelman wrote that he was not provided any medical records to review prior to his examination. Plaintiff told Dr. Adelman that he recently began drinking heavily again. Tr. at 296. After his examination (Tr. at 297), the doctor wrote:

> Mr. Nutter presents as a 33–year old gentleman who tells me that he was involved in a bike accident in October of '97 following which he was in a coma for a period of time. Although he tells me that he awoke in a psych unit, it would appear that he has suffered nurologic injury. His examination is remarkable for what would appear to be a right 4th nerve palsy which, in all likelihood, is post-traumatic in nature. He also has an ataxic gait with hyperreflexia on the left and hemiataxia of his left body side. He very well may also have some post-traumatic cognitive dysfunction. His alcohol intake may also be clouding the issue to some degree.

Tr. at 297–98. The doctor concluded his report by opining that Plaintiff is unable to lift anymore than five to ten pounds, that he is unable to stand or walk without risk of fall and that he is unable to stoop, climb, kneel or crawl because of unsteadiness. The doctor observed that Plaintiff is somewhat clumsy in handling objects with his left upper extremity. He said that Plaintiff is able to see, hear, speak and travel. Tr. at 298.

On August 20, 1998, Plaintiff saw psychiatrists Berald T. Gambrill, M.D., and Barbara Rohland, M.D., at the University of Iowa. Plaintiff reported continued behavioral and mood problems. Axis I diagnoses were: 1) Behavioral disturbance not otherwise specified in context of recent closed head injury; 2) history of polysubstance abuse, currently in remission; and 3) Rule out mood disorder secondary to general medical condition. On Axis V, Plaintiff's global assessment of functioning was rated at 60[3] Plaintiff was given a prescription of anti-depressant medication, and counseling was recommended. Tr. at 343–44.

Plaintiff was seen for a neuropsychological evaluation at the University of Iowa on August 28, 1998. Joe Barrash, Ph.D. wrote that the evaluation indicated "considerable improvement in neuropsychological functioning compared to our 11/97 evaluation." The psychologist continued that the exam results were still indicative of residual compromise in executive functioning. Problems such as impulsivity, impatience, weak frustration tolerance, difficulties with planning and strategy application would likely be more problematic under more stressful conditions than during a testing situation, according to the psychologist. Dr. Barrash recommended neuropsychological rehabilitation if Plaintiff were motivated to work on maximizing his ability to maintain behavioral control and to exercise the best judgment possible. Tr. at 345.

Plaintiff saw the psychiatrists at the University again on October 15, 1998. He had self-discontinued the antidepressant medication Zoloft because it was causing diarrhea. Because he was still having symptoms of depression, the doctors pre-

---

**3.** The Axis V diagnosis is used for reporting the clinician's judgment of the patient's overall level of functioning. Diagnostic And Statistical Manual of Mental Disorders, Fourth Edition Text Revision (DSM–IV–TR), at page 32. The Global Assessment of Functioning (GAF) is a scale of 0—indicating inadequate information—to 100—indicating superior functioning. The scale is divided into 10 deciles. For example, the score of 60 which was given above, indicates the doctor's opinion that the patient is at the top of the decile between 51 and 60. This decile indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34. The DSM–IV–TR cautions, however, that the diagnostic categories are subject to misuse or misunderstanding when used for forensic purposes in legal situations such as disability determinations. "In determining

whether an individual meets a specified legal standard (e.g., for ... disability), additional information is usually required beyond that contained in the DSM–IV diagnosis.... It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.... Nonclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the cause of the individual's mental disorder or its associated impairments." *Id.* at page xxxiii. One is reminded of Judge Cummings' admonition that lawyers and judges should resist the temptation to play doctor and make their own independent medical findings. Rather, Judge Cummings continued, psychiatrists [and psychologists] are the experts on mental health issues. *Rohan v. Chater*, 98 F.3d 966, 970–71 (7th Cir. 1996) citing among other cases, *Wilder v. Chater*, 64 F.3d 335 (1995).

scribed Prozac. Diagnoses were the same as at the August 20, examination. Tr. at 341. Plaintiff was seen again on January 28, 1999. At this examination it was noted that Plaintiff had discontinued his medication because he was unable to buy it. Plaintiff told the doctors that he was able to manage his anger without the use of Thorazine. It was also noted that Plaintiff was pursuing part-time employment. He was given another prescription for Prozac and said he would be more compliant with the doctor's directions. The doctors gave Plaintiff coupons for a month's supply of medication. The psychiatrists' Axis I diagnoses were the same as on the previous occasions. The Axis V, diagnosis, however, was rated at 65 [4].

Plaintiff was seen for an intake interview at the Iowa Department of Vocational Rehabilitation on June 30, 1998. Tr. at 520–22. Plaintiff was homeless and had no means of support. He felt desperate and confused, and was seeking help getting public assistance. The evaluator wrote: "The likely focus of rehabilitation would be assistance with housing, vocational and educational assessment and training, and job placement assistance." Tr. at 522. Plaintiff continued to work, off and on, with this agency until his file was closed on September 21, 1999, because of a lack of contact. Tr. at 512.

A University of Iowa physical therapy report dated December 3, 1998, states that Plaintiff was seen for assistance with his unsteady gait. Plaintiff was tested with various devices and it was determined that one known as a "Lofstrands" would be the best choice, however the therapist was unsure of Plaintiff's compliance. The therapist wrote: "But he likely would need close supervision due to his ataxia and limited thought processing." Tr. at 578.

X-rays of Plaintiff's left knee, taken on December 10, 1998, at Broadlawns Medical Center revealed no abnormality. Tr. at 616. A physical therapy report dated January 15, 1999, states that Plaintiff had been seen six times during the previous month for his knee pain. Plaintiff reported significantly less pain. He also complained of pain in his hip and thigh. Plaintiff was to continue therapy on a twice weekly basis for an additional month. Tr. at 607. Plaintiff was discharged from physical therapy on March 18, 1999. Although the therapist noted that the goals had not been met, Plaintiff reported that he was somewhat better and said that he would continue his exercise program. Tr. at 595.

Plaintiff was seen by psychiatrists Gerald T. Gambrill, M.D. and Bruce Pfohl, M.D. at the University on June 3, 1999. Plaintiff had discontinued his prozac after his supply of medication had run out. Plaintiff was unable to remember whether or not his mood was better while taking the medication. The doctors, through a member of the hospital staff, had learned from Plaintiff's mother that Plaintiff had ongoing difficulty with his memory. The doctors wrote that the memory difficulty was evident during their interview and that they believed it was secondary to the head injury. The doctors' multiaxial diagnoses were the same as on other occasions with a GAF score of 65. Tr. at 618.

Plaintiff was seen for a neuropsychological evaluation by William R. McMordie, Ph.D. on August 4, 1999. Plaintiff had been scheduled for an all day examination,

---

**4.** A rating of 65 would indicate that Plaintiff fell mid point between 61 and 70, which is described as: "Some mild symptoms" (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM–IV–TR at 34.

but the session was terminated prematurely by Dr. McMordie because of the questionable validity of Plaintiff's performance. Dr. McMordie administered the WAIS–III, Rey Osterrieth Complex Figure Test, Controlled Oral Word Association Test, and Memory Malingering Paradigms. The psychologist noted that Plaintiff arrived early for the session and chose to lie on the floor of the waiting area because of back pain. While being observed, Plaintiff walked with a wide-based, impaired gait. "However, on unobtrusive observation of him during a break as well as after the assessment session in the lobby he did not continue to demonstrate the impaired gait." Tr. at 350. On the WAIS–III, Plaintiff scored a verbal IQ of 71, a performance IQ of 70, and a full scale IQ of 68. Dr. McMordie wrote:

> The only logical explanation for the results obtained is purposeful malingering and/or exaggeration of existing deficits. This writer began with the WAIS. This test was administered in February of 1998 by Dr. Phillip Ascheman. The results of that assessment with the WAIS can be contrasted to those of this writer. The table [on page 351 of the transcript] presents the percentiles for the various subtests along with the Verbal, Performance, and Full Scale IQ estimates and percentiles. There is an extreme decline in performance on this instrument when the current results are compared to what had been obtained previously. His Verbal IQ has declined by 21 points, Performance IQ by 17 points, and the Full Scale IQ by 20 points. This is an extreme decline and would suggest that there has been some significant untoward event affecting cognitive functioning. This certainly is not the case according to the record. Also, it is atypical of the pattern that one sees after a head injury, i.e., the tendency to either stabilize or improve with the passage of time. Thus, this extreme decline does not make any degree of common sense. The pattern of his performing through the tests was inconsistent. Some of the types of errors he made were not compatible with the effects of any neurological dysfunction but more likely to be a manifestation of either purposeful malingering or exaggeration of problems. The Rey Osterrieth Complex Figure Test was performed in a grossly impaired manner. The Controlled Oral Word Association Test was performed at the 15th percentile. It is difficult to state what that means in light of the questionable validity of his test results, but it does not fit the pattern expected. This writer introduced some malingering paradigms, and he performed in a manner more suggestive of feigning cognitive difficulties.

Tr. at 351.

On November 22, 1999, Plaintiff was seen by Kenneth P. Schultheis, D.O. at the emergency room of Mercy Hospital in Des Moines. Plaintiff complained of back pain and requested a referral to physical therapy and pain medication. On physical examination, Plaintiff appeared chronically ill. He was given a prescription for Motrin 800 and a referral to the Mercy Nurse for a clinic appointment. Tr. at 620. Plaintiff had also gone to the emergency room on September 2 and October 6, 1999 for similar complaints. Tr. at 621 and 622. Plaintiff was seen by a physical therapist on February 4, 2000. Plaintiff's chief complaint was chronic lower back and bilateral hip pain. He also complained of pain in his shoulders and knees. After an examination, the therapist opined that Plaintiff would benefit from a program of stretching and strengthening aimed at improving flexibility of the muscles in his hips and low back. Tr. at 630.

Plaintiff went to Mercy Family Medicine Center on January 17, 2000, where he was seen first by Tim Breedlove, M.D., who diagnosed neurologic dysfunction, and a psychiatric disorder not otherwise specified. Dr. Breedlove wrote that he suspected a schizophrenic disorder. Tr. at 645. Tr. at 638–39. Plaintiff also saw Christopher White, M.D. Plaintiff complained of pain everywhere—hips, groin, joints, and shoulders. He also complained of mood swings and depression. Dr. White noted that Plaintiff's physical examination was normal but that Plaintiff had "a lot of psychoneurological difficulties". Plaintiff was referred to Mercy Franklin Center for a psychiatric examination and to Ruan Neurologic Center. Tr. at 644. On February 4, 2000, Plaintiff saw Michael Blue, D.O. Tr. at 642–43. Dr. Blue noted that Plaintiff had seen a neurologist the day before and that an appointment with a psychiatrist was set for the next week. Plaintiff admitted to hearing voices and he became emotionally labile when questioned about his ability to sleep: "When queried about his sleep habits, he says he only sleeps about 2 hours a night, and he immediately broke down to tears and cried from interval. This is the first time he has been able to tell anybody that he has not been sleeping well." Plaintiff reported periods of incontinence of bowel and bladder and loss of neurologic control. Dr. Blue noted that Plaintiff exhibited "consistent flight of idea" during the interview, but that his emotional expression was appropriate. Tr. at 643. The doctor prescribed medication—Remeron—but said that he would consider other medications for continued psychotic episodes "however, I suspect a traumatic brain injury with sleep deprivation component are probably more likely the source of this fellow's distress rather than a pure schizophrenia psychosis of an organic nature." Tr. at 642–43. On February 7, 2000, Plaintiff told Dr. Blue that he had discontinued taking Remeron be-

cause it made him feel agitated, which the doctor said was an acceptable reason. On physical examination, Dr. Blue observed spasticity of several muscle groups. Tr. at 640. Dr. Blue concluded his report: "At some point in the future, it may be worthwhile having him visit a psychiatrist with some experience in traumatic head injuries. This appears to me to be consistent with behavioral neurologic patterns of that disorder rather than pure definitive psychiatric illness, even in spite of his previous addictive disorders." Tr. at 639. Plaintiff also saw Dr. White on the 7th. Dr. White wrote: "We are going to keep him as functional as we can for as long as we can and get him all the support he needs for his problems." Tr. at 638.

Dr. Breedlove wrote a report to Disability Determination Services dated May 22, 2000. Tr. at 649–52. Dr. Breedlove stated that Plaintiff had not complained of double vision in his visits to the Mercy Clinic, but that he frequently complained of muscle spasm and/or muscle pain as well as pain in his joints. Tr. at 649. Dr. Breedlove wrote:

> On initial exam in my office, the first time I saw the patient, he exhibited several neurological signs that could be consistent with damage from a closed head injury, but in subsequent visits, the patient's physical exam and neurological exam have been inconsistent and have changed from visit to visit, leading me to believe that he has no residual deficit from this accident. Frequent muscle cramps and aches, possibly, could be related to inactivity in that patient admits to little activity. I have attempted exercise programs, nonsteroidal anti-inflammatory drugs, and muscle relaxers to aid him in this case with which he is frequently noncompliant. When he does take these medications as prescribed, he states that they help considerably. On numerous visits when patient com-

plained of severe muscle spasm, I am unable to elicit the expected signs and symptoms that would accompany this complaint and unable to locate any muscle spasm in the mentioned areas, leading me to believe that our patient is malingering. Patient was referred to a psychiatrist here in town who also documented a diagnosis of malingering in this patient.

Among the list of eight diagnoses were history of antisocial personality disorder, drug seeking behavior, and malingering. Dr. Breedlove opined that Plaintiff's capacity for lifting and carrying was that of someone of his size and age. The doctor said that there was no reason that Plaintiff could not ambulate normally in the course of a work day, but that he may have some difficulty with muscle cramps with sitting for prolonged periods. The doctor said that Plaintiff's major work limitation was his difficulty with anger reactions and impulse control related to anti-social personality traits and depression. Tr. at 650.

> He is currently on a medication for his depression, which should help resolve those problems, but I am afraid that only p.r.n. treatment with Thorazine for anger reactions and anxiety related to his antisocial personality traits is available. It is unlikely that any type of treatment will assist with this. This will rely strictly on the patient's compliance and willingness to perform better in a social environment.

Tr. at 650–51. The doctor also wrote that he recently found out that Plaintiff had undergone memory testing at the University of Iowa which did not show memory deficits. This was in spite of the fact that Plaintiff had previously denied such testing. Plaintiff was very angry about the report. Tr. at 651.

Plaintiff was seen at Eyerly–Ball Community Mental Health Services from July 17, 2000, to January 26, 2001. Tr. at 669–85.

A treatment note dated October 4, 2000, signed by Derek A. Fickenscher, M.D. at Partners In Health states that Plaintiff's care had been transferred there after Plaintiff had an angry outburst at the Mercy Clinic after which he was refused treatment at that facility. Tr. at 700.

Plaintiff saw Dr. Ascheman again on March 8, 2001. Tr. at 702–05. The psychologist said that medical records from Eyerly–Ball Community Mental Health Services had been provided for his review, but nothing further. Dr. Ascheman did not make reference to his 1998 evaluation. The doctor noted that when Plaintiff arrived at his office, he exhibited dramatic and exaggerated behavior such as loudly coughing and hacking. He also fell asleep in the waiting room and "gave the appearance of being difficult to arouse." During the interview, Plaintiff repeatedly complained of being confused, "but overall, his responses to questions were well organized and appropriately detailed, although there was repeated evidence of over exaggeration of symptoms as well as minimization of his own responsibility for behaviors." Tr. at 702. On the Wechsler Memory Scale—III, Plaintiff scored quite low, less than the first percentile on most of the indexes. "The patient appeared to give minimal effort, frequently responding that 'I don't know.' " Tr. at 704. Dr. Ascheman opined that the scores were invalid. The doctor went on to opine that Plaintiff's presentation and self report contain deceptiveness which supports a diagnosis of malingering. The doctor wrote: "Based on his ability to recall important information from his history and to follow directions during the interview, as well as his ability to apparently function quite independently at home, it is my opinion that this individual does not experience significant difficulties with attention, concentration or memo-

ry." The doctor continued that Plaintiff was able to act appropriately and behave in a stable manner when he believes it is in his best interest to do so. Tr. at 705.

Plaintiff was seen at On With Life at Ankeny by psychologist Kenneth R. Mills, Ph.D. on June 19 and 20, 2001, on referral from Dr. Fickinger[5], for brief neuropsychological assessment. Tr. at 724–26. Plaintiff was aware of Dr. Ascheman's diagnosis of malingering, and assured Dr. Mills that he was not pretending to be sick. Plaintiff appeared as a moderately obese man who ambulated with an awkward gait. He was dressed in shorts and tank top with no shoes. "Personal hygiene was borderline and his overall appearance was disheveled, according to Dr. Mills." Plaintiff was restless and complained of constant shoulder and back pain throughout the testing. Tr. at 724. The doctor noted that several times, Plaintiff laid across the testing table, stretched backward in his chair or got up to walk around to relieve "his perceived pain." It appeared to Dr. Mills that Plaintiff put forth good effort on all testing protocols. Dr. Mills administered the Benton Facial Recognition Test, Form SL, Raven's Coloured Progressive Matrices, Rey Auditory Verbal Learning Test, Wide Range Achievement Test, Revision III, and the Wechsler Memory Scale—III. Based on the Raven's Coloured Progressive Matrices, Plaintiff's full scale IQ was estimated to be 95, in the average range for his age group. Tr. at 725. At the conclusion of the report, Dr. Mills wrote that Plaintiff's neuropsychological assessment was consistent with the sequelae of a traumatic brain injury. "These symptoms are seen as presenting potentially significant impairment to his ability to obtain and maintain gainful employment." The psychologist stated that while a full neuropsychological assessment was indicated to determine the exact nature and extent of Plaintiff's impairment, he found no evidence of malingering on Plaintiff's part. Tr. at 726.

Plaintiff saw Dr. Mills again on several occasions for a neuropsychological evaluation to assist in the application for disability benefits. Tr. at 727–42. Plaintiff was seen December 7 and 27, 2001, January 7, 11, 18, and 25, 2002. Tr. at 727. Plaintiff's medications were percocet, amitryptiline, and klonopin. Tr. at 728. Dr. Mills administered the Beck Depression Inventory, Stroop Color Word Test, Wechsler Adult Intelligence Scale—III (WAIS—III), Wechsler Memory Scale—III, Wide Range Achievement Test—III, and Wisconsin Card Sorting Test. Tr. at 729. On the WAIS—III, Plaintiff scored a verbal IQ of 82, a performance IQ of 81, and a full scale IQ of 80. These scores placed Plaintiff in the low average range of intelligence. The scores on the memory scale were commensurate with Plaintiff's intellectual functioning. Tr. at 737. Toward the end of his report, Dr. Mills stated that Plaintiff had participated in individual counseling at the doctor's clinic since the summer of 2001. The psychologist wrote that the testing data revealed significant impairment of attention, concentration and memory and that Plaintiff appeared significantly depressed. Dr. Mills' Axis I diagnoses were amnestic disorder due to head trauma; and adjustment disorder with mixed anxiety and depressed mood. On Axis II, the doctor diagnosed "rule out antisocial personality disorder." Dr. Mills rated Plaintiff's GAF at 35[6]. Tr. at 741.

---

**5.** The doctor's name is spelled "Fickinger" in the report, but the Court believes that Dr. Fickenscher is the doctor being referenced.

**6.** A GAF between 31 and 40 indicates: "Some impairment in reality testing or communica- tion (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats

Dr. Mills wrote that while Plaintiff appears to be able to understand work-related instructions and procedures, he is likely to experience significant difficulty remembering any but the most simple instructions and procedures. Plaintiff's ability to maintain attention is also significantly limited, according to the psychologist. Dr. Mills wrote that Plaintiff demonstrated adequate interpersonal skills during his testing, but that the sessions were in a supportive environment with familiar mental health professionals. In other settings, he opined, Plaintiff could be interpreted by others of being rude, aggressive or uncouth. Tr. at 741. He also opined that Plaintiff may experience difficulty adjusting to significant changes in the work place. Dr. Mills concluded his report:

> In my professional opinion, and to a reasonable degree of medical certainty, Mr. Nutter demonstrates cognitive impairment which is consistent with the sequelae of traumatic brain injury. Paradoxically, it appears that behavior resulting from his cognitive impairment (missed appointments, impaired deportment, poor hygiene and dress) has interfered with him being determined to be eligible for disability services.

Tr. at 742.

### ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing before the ALJ on December 20, 2001. Tr. at 82–127. Plaintiff testified he can lift 40 or 50 pounds occasionally and 20 pounds on a more frequent basis. He testified that he can stand, sit, or walk for about five minutes at a time. Tr. at 118. Plaintiff said that it is difficult for him to reach above his shoulders because of his problems with balance. Tr. at 119.

After Plaintiff testified, the ALJ called Marian Jacobs to testify as a vocational expert. Tr. at 119. The ALJ asked the following hypothetical:

> I would like you to consider a hypothetical person who would be able to lift 50 pounds occasionally, 20 pounds repeatedly. He could stand or walk up to five minutes at a time, for a total of two hours a day. He would be able to sit five minutes at a time before needing to change position and would be able to sit up to six hours a day. He could do no bending, stooping, twisting, squatting, kneeling, crawling, or climbing. He could not work with his arms above shoulder height. He should not work around heights or moving machinery. He would be limited to simple, routine, repetitive work, not requiring close attention to detail. He could have occasional contact with the public, co-workers, and supervisors. He would require occasional supervision. And his concentration would be mildly limited. He would have the disabilities of status post-closed head injury. Let's see, what else do we have here? Occasional double vision and a personality disorder....
>
> No more than a regular stress level.

Tr. at 120–21. In response, the vocational expert testified that Plaintiff would not be able to do any kind of work. Tr. at 122. Next the ALJ asked:

> Again, this person would be able to lift up to 50 pounds occasionally, 20 pounds repeatedly. He could stand or walk up to two hours total out of an eight-hour workday. He could sit for up to six hours. He could walk up to two miles. He should not do any climbing, nor could he do any fine manipulation with the left upper extremity, nor could he work with his left upper extremity above shoulder height. He could not work around heights or moving machinery. He could not do complex technical work

up younger children, is defiant at home, and is failing at school)." DSM–IV–TR at 34.

requiring extensive reading or writing. He would be limited to simple math only. He could have occasional contact with the public, co-workers, or supervisors. He would need occasional supervision, and he could work at only a regular pace. Again, his stress level would be only of that found in a normal commercial office setting. Would such a person be able to return to any of the claimant's past relevant work?

Tr. at 122–23. In response, the vocational expert testified that Plaintiff would not be able to do any of his past work, but that there would be unskilled work that he could do. Examples included, document preparer, addresser, and cutter and paster of press clippings. The vocational expert also said that the hypothetical would accommodate a wide range of sedentary unskilled work. Tr. at 124.

In response to questions from Plaintiff's counsel, the vocational expert said that if Plaintiff was not able to work at more than a slow pace because of problems with attention, concentration, short-term memory and mood swings, he could not work. Tr. at 125. Likewise, if Plaintiff was unable to complete a job, he would not be able to do competitive employment, according to the vocational expert. Tr. at 126.

### ADMINISTRATIVE DECISION

In the decision dated May 24, 2002, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time after the alleged onset of disability date. At the second step, he found that Plaintiff's severe impairments are a history of substance abuse, a personality disorder and status post a closed head injury. At the third step, the ALJ found that none of Plaintiff's severe impairments meet or equal any listed in Appendix I, Subpart P, Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is unable to perform his past relevant work. The ALJ found Plaintiff has the residual functional capacity to work consistent with his second hypothetical, and that Plaintiff is able to do the types of work identified by the vocational expert. Tr. at 28. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 29.

### DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

In the case before the Court, the ALJ found that Plaintiff is unable to do any of

his past relevant work. The burden of proof, therefore, shifted to the Commissioner to prove that Plaintiff retains the residual functional capacity to perform other work as well as proving that other work exists in significant numbers in the national economy that can be done by a person with such a residual functional capacity. *Hensley v. Barnhart,* 334 F.3d 768, 769 (8th Cir.2003) (referring to the "two pronged inquiry at step 5 of the sequential evaluation").

 The essence of Plaintiff's argument is that the ALJ improperly rejected the opinion of treating psychologist, Dr. Mills, and, therefore, the hypothetical question to the vocational expert was defective. Because the hypothetical was defective, Plaintiff continues, the responses thereto do not constitute substantial evidence with which the Commissioner is able to meet her burden. Plaintiff is correct that Dr. Mills is a treating source, and that his opinion is entitled to great weight. *Dixon v. Barnhart,* 324 F.3d 997, 1002 (8th Cir.2003). Nevertheless, an ALJ may reject the opinion of a treating physician if it is contradicted by other substantial evidence. *Dolph v. Barnhart,* 308 F.3d 876, 878–79 (8th Cir.2002). In *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001), the Court wrote: "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole. (Citation omitted). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."

In the case at bar, Plaintiff has been evaluated by a number of physicians and psychologists who have offered professional opinions on Plaintiff's ability to function. There is no question that Plaintiff suffered a severe head injury that has affected his ability to function. The issue, however, is

whether that impairment prevents him from performing all types of work. *See, e.g. Hogan v. Apfel,* 239 F.3d at 961. ("As is often true in disability cases, the question was not whether Hogan was experiencing pain, but rather the severity of her pain.")

From the onset of his injury in November of 1997, Plaintiff has given all of his doctors the impression that he was not as limited as he claimed to be. While he was still "unconscious" Plaintiff gave inconsistent responses to noxious stimuli. While Plaintiff was being evaluated for his complaints of double vision at the University of Iowa, Dr. Boone noted that it was difficult to get Plaintiff to cooperate with her examination and that she often got fluctuating measurements. As a result, Dr. Boone did not recommend prism lenses until after a follow up examination. When Plaintiff saw neurosurgeon Kenneth Follett at the University in May of 1998, the doctor could detect no diplopia. Dr. Follett also wrote that Plaintiff stance and gait were normal and that Plaintiff has full strength in his extremities. A CT scan, obtained to rule out any late sequelae of the head injury, showed no intracranial pathology.

When Plaintiff was seen by Dr. Ascheman in February of 1998, he walked normally while he thought he was not being observed. When he was aware that he was being watched, however, he demonstrated an exaggerated gait with unusual foot movements. It was also obvious to Dr. Ascheman that Plaintiff's inconsistent effort on IQ tests yielded an underestimation of his level of intelligence. Nevertheless, Plaintiff scored in the average to low average range.

Dr. Lovell suspected that Plaintiff was not putting forth consistent effort, so she administered a validity indicator profile which produced invalid results suggesting,

among other things, a deliberate attempt to perform porrly.

In August of 1998, University of Iowa psychologist Joe Barrash, wrote that his evaluation indicated considerable improvement in Plaintiff's neuropsychological functioning. Although he wrote that Plaintiff performance would be more problematic under more stressful conditions, he recommended neuropsychological rehabilitation to maximize Plaintiff's ability to maintain behavioral control.

On August 4, 1999, Plaintiff saw William McMordie, Ph.D. Again, Plaintiff's unusual gait vanished while he thought he was not being observed, and manifested itself while he was in the presence of others. Plaintiff's low scores on the WAIS could only be explained, wrote Dr. McMordie, by a purposeful malingering. Dr. McMordie wrote that the typical pattern in a head injury case was for the condition to either stabilize or improve with the passage of time. Dr. McMordie pointed out that many of Plaintiff's errors were not compatible with neurological dysfunction. When tests of malingering were administered, "... he performed in a manner more suggestive of feigning cognitive difficulties."

Treating physician Dr. Breedlove, wrote that while he initially suspected neurological consequences from a brain injury, "... in subsequent visits, the patient's physical exam and neurological exam have been inconsistent and have changed from visit to visit, leading me to believe that he has no residual deficit from this accident." Dr. Breedlove went on to write that Plaintiff's complaints of pain could well be due to his inactivity. Dr. Breedlove's diagnoses included drug seeking behavior and malingering. Dr. Breedlove reported that recent testing at the University of Iowa had not shown memory deficits. Thereafter, Plaintiff had an angry outburst at Dr. Breedlove's clinic and was refused further treatment.

Plaintiff saw Dr. Ascheman again in March of 2001. Once again, Plaintiff behaved in a "dramatic and exaggerated" manner. It was obvious to Dr. Ascheman that Plaintiff was giving minimal effort to the testing protocols. The doctor wrote that Plaintiff's presentation and self reports contained deceptiveness which supported a diagnosis of malingering. It was Dr. Ascheman's opinion that Plaintiff does not experience significant difficulties with attention, concentration or memory.

In stark contrast to the numerous reports outlined above are the reports of Dr. Mills. The best that can be said of Dr. Mills' opinion that Plaintiff's behavior is the sequelae of traumatic brain injury, is that his opinion is substantial evidence which detracts from the ALJ's decision that Plaintiff is not disabled. The mere presence, however, of substantial evidence which would support an opposite conclusion than that reached by the ALJ, is not enough to require reversal. The Court of Appeals for the Eighth Circuit has held many times that even when it is possible to draw inconsistent conclusions from the evidence, the Commissioner's decision must be affirmed. *See, e.g., Osborne v. Barnhart,* 316 F.3d 809, 811–12 (8th Cir.2003) and cases cited therein.

If Dr. Mills opinion of Plaintiff's disability stood alone, or were only contradicted by one or two of the other non-treating medical opinions as Plaintiff argued on page 20 of his brief, Dr. Mills would have perhaps carried the day. Here, however, time and time again, before treating and examining physicians and psychologists alike, Plaintiff has demonstrated his proclivity for malingering. Plaintiff was not denied benefits because he is difficult to deal with, or because he may not be the most likeable person in the world. Rather, his claim was denied because numerous physical and mental examinations failed to

demonstrate a disabling condition. In other words, the ALJ's decision is supported by substantial evidence on the record as a whole. *See Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) citing *Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Just as the Court would not affirm the Commissioner's decision on the basis of *some* substantial evidence supporting it, neither will the Court reverse because *some* substantial evidence detracts from it. Rather, the test is whether the Commissioner's final decision is supported by *substantial evidence on the record as a whole.* In this case, it is.

## CONCLUSION AND DECISION

In the case at bar, the Court has very carefully considered the weight of the evidence which supports the Commissioner's final decision as well as that which detracts therefrom. As instructed by the cases cited above, the Court has taken into consideration the weight of the evidence in the record and applied a balancing test to the evidence which is contradictory. Having done that, only one conclusion is possible. The Commissioner's decision is supported by overwhelming substantial evidence on the record as a whole and is, therefore, affirmed. The case is dismissed. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.