# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3213

_____

| | | |
|---|---|---|
| Glenn Delph, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the Eastern |
| v. | * | District of Arkansas. |
| | * | |
| Michael Astrue, Commissioner, | * | |
| Social Security Administration, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: June 13, 2008
Filed: August 15, 2008

_____

Before LOKEN, Chief Judge, COLLOTON, Circuit Judge, and PIERSOL[1], District
Judge.

_____

PIERSOL, District Judge.

Glenn Delph was found disabled as of April 11, 1988, by the Social Security
Administration (SSA). SSA found that Delph's degenerative disk disease of the
cervical and lumbar spine, back injury, mood disorder, and schizoaffective disorder
precluded work and rendered him disabled. He was awarded disability insurance

_____

[1]The Honorable Lawrence L. Piersol, United States District Court for the District of South Dakota, sitting by designation.

benefits (DIB) and supplemental security income (SSI) payments. On December 10, 1998, SSA notified Delph that a records review revealed his condition had improved and he was no longer disabled. That determination was upheld after a hearing before an Administrative Law Judge (ALJ). Delph filed suit in district court. In a decision issued on January 17, 2003, the district court held that the ALJ failed to follow the eight-step sequential process required in medical improvement cases. The case was remanded for further administrative proceedings.

During the pendency of his appeal in district court, Delph had filed a second application for DIB and SSI on October 17, 2001. The second application alleged the same disability onset date as the first application, and SSA consolidated the second application with the case on remand. An ALJ held a hearing on August 26, 2003. Delph was present and represented by a lawyer. The ALJ denied Delph's second application for benefits, and again found that Delph's condition had improved and he was no longer disabled as of December 1, 1998. After SSA's appeals council denied his request for review on March 22, 2005, the ALJ's decision became the Commissioner's final decision and Delph filed another civil action in district court. On September 21, 2006, the district court[2] affirmed SSA's final determination and dismissed Delph's case with prejudice. This appeal followed. For the reasons set forth below, we affirm the judgment of the district court.

I

Delph began working as a process specialist in a paper mill in 1978. At times, Delph's work required him to lift 100-pound rolls of paper, and he injured his back in 1988. He was referred to Dr. Blackwell, an orthopedic surgeon. Dr. Blackwell's initial impression after examining Delph on April 19, 1988, was "lumbosacral strain

---

[2]The Honorable John F. Forster, Jr., United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was referred for decision by consent of the parties pursuant to 28 U.S.C. § 636(c).

with stiffness." Dr. Blackwell prescribed medication and exercise therapy. An attempt by Delph to return to work in June was unsuccessful. He was referred to a neurologist, Dr. Abraham, who recommended physical therapy, medication and decreased activities for Delph's back pain. Medical records from treating physicians indicate that Delph suffered from muscle spasms in his back shortly after his injury in 1988, and muscle spasms were still present in March and April of 1995. A report from the University of Arkansas for Medical Sciences indicated that in April 1995 Delph could walk with a cane for only up to three or four blocks per day.

At the time of the initial determination of disability in 1995, Delph was 37 years old and had two years of college. As part of the initial determination process, he was referred by SSA for both a medical and a psychological examination. A psychological consultative examination was performed by Barry McDonald, Ph.D., on June 21, 1995. Dr. McDonald described Delph as functioning "at the upper end of the Borderline range of intelligence." He was concerned about the discrepancy between Delph's low IQ and his high average reading ability, noting that it is "strongly suggestive of a drop or reduction from a previous, higher level of intellectual functioning due to major psychological maladjustment or organicity." Dr. McDonald diagnosed mood disorder, anxiety disorder, cognitive disorder, probable pain disorder with psychological factors (Axis I); and personality disorder with passive-dependent and socially avoidant and possibly dysthymic and schizoid traits predominating (Axis II).

The consultative medical examination was done by Harold Chakales, M.D., on May 3, 1995. Delph was walking with an antalgic gait and using a cane. Dr. Chakales reported that xrays of the lumbar spine showed degenerative disc disease with Smoral's nodes at L4-L5 and L5-S1. Examination of the lumbar spine showed straightening of the lordosis, 70 degrees forward flexion and 10 degrees of lateral tilt. Examination of the cervical spine showed 20% restriction in all planes of motion. Delph lacked 10-15 degrees of hyperextension of shoulders and forearms in both of

his upper extremities. Dr. Chakales' diagnoses were lumbar degenerative disc disease, cervical degenerative disc disease, psychophysiological musculoskelatal system reaction manifested by chronic neck pain and low back pain, and chronic pain syndrome. He found that Delph was a "poor rehabilitative candidate."

Based upon the records and consultative examinations, the ALJ found that Delph's physical and mental restrictions precluded him from doing even sedentary work, and a fully favorable decision awarding him benefits was issued on September 27, 1995.

Between the disability determination in 1995 and the 1998 review initiated by SSA, Delph continued to seek treatment at the Family Medical Center. The medical records show that much of the treatment during that time period was for high blood pressure, but Delph often complained of neck, back and knee pain. For example, on October 16, 1996, Delph complained of chronic neck pain after running out of his prescription for Voltaren. Dr. Brillhart prescribed Daypro and suggested physical therapy if the pain did not improve. In June 1997, Delph complained of headaches and increasing neck pain extending into the right shoulder. He also mentioned left knee pain. He was given a prescription for Voltaren and physical therapy was recommended. A CT scan of his left knee in July 1997 showed arthritis with mild degenerative changes. His knee pain apparently was alleviated by a steroid injection on October 10, 1997.

During the review process in 1998, Delph was referred to S.A. Broughton, M.D., for a psychiatric consultative examination, and to Khalid Mahmood, M.D., for an internal medicine consultative examination. Dr. Broughton conducted an examination on October 27, 1998. He diagnosed Delph with adjustment disorder with depressed mood (Axis I); history of chronic back and neck pain and hypertension (Axis III); and an Axis IV rating of moderate. Delph had a Global Assessment of Functioning ("GAF") score of 60.

The consultative medical exam was conducted on October 20, 1998. Dr. Mahmood diagnosed hypertension and degenerative disc disease of the cervical and lumbar spine with questionable radiculopathy. He concluded that Delph had "moderate physical disability because of severe neck pain and lower back pain. However patient can sit, stand and walk without any problems." Delph was no longer using a cane to walk and he had a normal gait.

A Psychiatric Review Technique Form dated December 9, 1998 was completed by an agency physician, Farrell Hillman, M.D. Dr. Hillman recognized that Delph had an affective disorder (an adjustment disorder with a depressed mood). He found that the mental impairment slightly affected Delph's activities of daily living, but there were no work restrictions. A Residual Functional Capacity Assessment Form was completed by another agency physician, Dan M. Spoor, M.D., on December 10, 1998. After reviewing the records, Dr. Spoor concluded that Delph could lift 25 pounds frequently and 50 pounds occasionally. He felt Delph could stand and walk 6 hours in an 8-hour day. Delph was completely restricted from climbing ladders and scaffolds and to only occasionally stooping and crouching. His reaching on the right was limited.

In a decision issued December 10, 1998, SSA determined that Delph's impairments had improved, that the improvements increased his ability to work, and that he was no longer disabled. Thus, his social security payments ended in December 1998. Delph appealed that determination within SSA. SSA took Delph's case under consideration and began gathering additional information.

On March 22, 1999, Daniel H. Donahue, Ph.D., a state agency psychologist, conducted a records review. Dr. Donahue noted evidence of depression which caused some deficiencies of concentration, persistence or pace, moderate difficulties in maintaining social functioning, and slight restriction of activities of daily living. Based on these limitations, Dr. Donahue concluded that Delph "is able to perform

work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete."

Delph continued to seek treatment at the Family Medical Center. His chief complaint on June 2, 1999 was severe neck pain and he was given a refill of his Amitriptyline prescription. On November 16, 1999, Delph complained of low back pain. Vioxx and Flexeril were prescribed. Delph sought treatment on December 22, 1999 for both back and neck pain. Again, Vioxx and Flexeril were prescribed, along with physical therapy. He began physical therapy on December 27, 1999. Delph was seen at the Family Medical Center again on March 28, 2000 for severe neck pain. He mentioned that he was trying to go to school but he was "very upset" and said, "he doesn't think he's getting anywhere." In addition to continuing the Amitriptyline and Flexeril, Delph was told to start taking 800 milligrams of ibuprofen twice a day. An MRI of his cervical spine was ordered. The MRI, dated April 1, 2000, showed degenerative changes extending from the C3-4 to C6-7, osteophytes and a slight narrowing of the spinal canal at C5-6 and C6-7, and a probable disc herniation at C4-5. Delph was referred to a neurosurgeon.

An administrative hearing regarding cessation of Delph's benefits was held on November 15, 2000. Delph testified that he was a senior in college with a 2.8 grade point average, and he attended classes 12 hours a week. Delph no longer used a cane to walk. He said he felt depressed sometimes, but he was not being treated for the depression.

Neurosurgeon T. Glenn Pait, M.D., evaluated Delph on January 11, 2001, and August 23, 2001 for his complaints of severe neck pain. On August 23, 2001, Delph's motor and sensory findings were intact, and his strength was 5/5 except for the left biceps and triceps which were 4/5. He had "some degree of limitation" of range of motion of the cervical spine. Dr. Pait gave Delph some Vioxx samples and suggested

a repeat MRI in order to determine whether surgery would be appropriate. After another MRI was done, Dr. Pait met with Delph on October 25, 2001, and he recommended surgery. Delph filed his new application for social security benefits on October 17, 2001.

SSA had another consultative medical examination of Delph conducted on January 9, 2002 by Syed Masood, M.D. Dr. Masood noted decreased range of motion with the cervical and lumbar spine, hips, knees, and ankles; uncontrolled hypertension; severe back and neck ache; and disc prolapse in the lumbar area. He determined that Delph had difficulty lying down, standing, walking, and that "he will not be able to carry or handle objects."

Jerry Thomas, M.D., performed a functional capacity assessment of Delph on January 23, 2002. He found the following exertional limitations: occasional lifting or carrying of 10 pounds; frequent lifting or carrying of less than 10 pounds, standing or walking at least 2 hours in an 8-hour workday; sitting for a total of about 6 hours in an 8-hour workday; pushing and pulling with upper extremities is limited; over head work is restricted. Delph also was found to be limited to only occasionally climbing, balancing, stooping, kneeling, crouching and crawling.

At the administrative hearing on August 26, 2003, Delph testified that he has a lot of pain in his neck, back, arm and both knees. He reported trouble with turning his head from side-to-side; he could only lift his arms about halfway over his head; and stooping, bending, and lifting hurt his back. Delph said he had not taken any prescription medications for four or five months because he could not afford them. He was taking Tylenol and ibuprofen. He had not been to a doctor for at least six months because he could not afford it. Delph testified that the neck surgery recommended by Dr. Pait was not done because he did not have insurance to cover the cost. Delph said he was able to drive short distances, cook meals, wash clothes, make his bed and occasionally attend church. In addition, he was a full-time college student

from 1998 to 2001, and he obtained a bachelor's degree in communications in 2001. Delph acquired some computer skills while in college, including word processing skills.

A vocational expert also testified at the August 26, 2003 hearing. After establishing that Delph cannot perform his past relevant work, the ALJ asked some hypothetical questions of the vocational expert. Regarding Delph's functional capacity as of December 1, 1998 through 2001, the ALJ asked the vocational expert to consider a 44-year-old individual with a high school education, an ability to stand and walk six hours, sit for six hours, lift and carry 20 pounds occasionally, ten pounds frequently, and who is precluded from overhead work. The vocational expert said such a person could perform the following jobs: teacher's aide, of which there were 3,000 jobs in Arkansas and 1.1 million nationally; and hotel clerk, with 1,800 jobs available in Arkansas and 150,000 nationally.

In the next hypothetical question, the ALJ asked the vocational expert to consider someone with Delph's functional capacity beginning in 2001, the date of his second application for benefits: a 46-year-old individual with a college degree and some basic computer skills, including word processing, who has the ability to sit for six hours of an eight-hour day, stand and walk two hours out of an eight-hour day, lift and carry ten pounds occasionally, and who is precluded from overhead work. The vocational expert responded that such an individual could perform the job of a general office clerk, of which there were 30,000 jobs in Arkansas and 3.1 million nationally.

In a decision issued on January 27, 2004, the ALJ determined that since at least December 1, 1998, Delph has not been disabled for Social Security purposes because his medical condition had improved enough for him to perform basic work activities, and jobs existed that Delph could have performed. In relation to his October 2001application for benefits, the ALJ decided that a number of jobs were available which met Delph's functional limitations at that time and Delph was not disabled.

The ALJ's decision became the Commissioner's final decision when the SSA appeals council denied Delph's request for review on March 22, 2005. On September 21, 2006, the district court affirmed the Commissioner's final decision and dismissed Delph's case with prejudice. This appeal followed.

II

This Court has jurisdiction to review the Commissioner's decisions pursuant to 42 U.S.C. § 405(g). Judicial review of the Commissioner's decisions is limited to determining whether the Commissioner's findings are supported by substantial evidence. *See Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* We must consider evidence in the record that fairly detracts from, as well as supports, the ALJ's decision. *See Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991).

When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity. *See* 42 U.S.C. § 423(f)(1). This "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. The continuing disability review process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f). *See Dixon v. Barnhart*, 324 F.3d 997, 1000-1001 (8th Cir. 2003). The regulations provide that determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine the following:

> 1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment,

(3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*See id.* (citing 20 C.F.R. § 404.1594(f)).

This sequential analysis for cessation of benefits includes the five steps to be followed in an initial disability determination. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993) (the five-step process for making the initial disability evaluation is: (1) whether claimant is engaged in substantial gainful activity, (2) whether claimant has a severe impairment, (3) whether the impairment meets or equals the severity of a listed impairment, (4) whether claimant has the residual functional capacity to perform past relevant work activity, and (5) if claimant is unable to do past work, whether claimant can perform other work). In evaluating Delph's 2001 application for benefits, the first four of the five steps required no analysis in addition to that undertaken by the ALJ in addressing the 1998 cessation of benefits issue. Step five, however, was handled separately by the ALJ when he determined Delph's functional capacity as of 2001 and decided whether work was available for him within those restrictions.

The ALJ first found that Delph has not engaged in substantial gainful activity. In the next step, the ALJ concluded that Delph's impairments do not meet or equal a listing in the impairments listed in Appendix I, Subpart P, Regulations No. 4. Step

three was whether Delph's medical impairments have improved. Improvement is measured from "the most recent favorable decision" that the claimant was disabled. 20 C.F.R. § 416.994(b)(1)(i). In this case, the most recent favorable decision was September 27, 1995. The ALJ determined that Delph's medical condition significantly improved after September 27, 1995. Next, in step four, the ALJ found that Delph's medical improvements increased his functional capacity and were related to his ability to perform work activity. Because of these findings, the ALJ skipped step five and moved on to step six in the sequential analysis. At step six, the ALJ noted that Delph's impairment or combination of impairments are severe within the meaning of the Regulations. A determination then had to be made at step seven whether Delph retained the residual functional capacity to perform the requirements of his past work. The ALJ found that Delph could not perform his past work. In the final step the ALJ, relying on the vocational expert's opinion, determined that work was available for Delph within his restrictions as of December 1998. In regard to Delph's 2001 application, in what is to be the fifth step of an initial disability determination, the ALJ concluded that beginning in 2001 Delph had a college degree and some computer skills, and his physical abilities were restricted to lifting only ten pounds occasionally, no overhead work, standing and walking for only two hours in an eight-hour workday, and sitting up to six hours. Relying on the testimony of a vocational expert, the ALJ found that Delph was capable of work as a general office clerk and that significant numbers of those jobs existed in the state and national economies. The ALJ then concluded that Delph was not disabled within the meaning of the Social Security Act.

On appeal, Delph argues that his condition did not improve after September 1995. Medical improvement "is determined by a comparison of prior and current medical evidence . . . ." 20 C.F.R. § 404.1594(c)(1). The regulations define medical improvement as:

> [A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you

-11-

were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994(b)(1)(i). The SSA initially found Delph disabled because his back injury and degenerative disc disease in the cervical and lumbar spine, mood disorder, schizoaffective disorder, and IQ of 81 precluded him from performing sedentary work. A careful reading of the ALJ's decision reveals that he compared Delph's prior and current medical evidence to determine whether there have been changes associated with his impairment.

At the time of the decision allowing benefits in September 1995, records from the University of Arkansas for Medical Sciences showed degenerative disc disease in Delph's neck and low back, continued muscle spasms in both areas, positive straight leg raising and, at the time, Delph was walking with a cane. The consultative examination by Dr. Chakales on May 3, 1995 confirmed the degenerative disc disease. Delph was walking with an antalgic gait and using a cane. He had 20 percent restriction of motion in all areas of his neck. The consultative mental health evaluation by Dr. McDonald on June 21, 1995 revealed a number of problems. Delph was reported to be moving slowly, groaning and using a cane to walk. He was occasionally tearful during the evaluation. He reported spending his time watching television and reading as his mother and sister did all of the chores. His IQ was 81. Based on this information the ALJ concluded that Delph was not able to do even sedentary work due to the combination of his physical and mental restrictions.

While there is no doubt that Delph continued to suffer from depression, neck, back and knee problems, and hypertension, there is substantial evidence in the record to support the ALJ's decision that medical improvement occurred after September 1995. Delph sought virtually no treatment for his depression, and Dr. Broughton's October 1998 report evidences a vast improvement in Delph's mental health.

Although he still suffered from degenerative disc disease and arthritis, his pain appeared to be controlled with medication and a steroid injection in his left knee. He stopped using a cane to walk and his gait became normal. Delph was able to attend school full time in 1998. He drove back and forth to school, cooked, did laundry and needed no significant help with his personal needs. The ALJ's decision must be upheld.

Delph asserts that the ALJ failed to consider the worsening of his cervical impairment. He points out that the radiology report of the April 2000 MRI indicates a change on the right side of the disc interspace at the C4-5 level when compared to the June 1, 1995 MRI. After the MRI in 2000, Delph was diagnosed with a herniated disc at C4-C5. He was referred to a neurosurgeon and that is when Delph started treatment with Dr. Pait who eventually recommended surgery on the cervical spine. The Court agrees that the diagnosis of a herniated disc in 2000 may be evidence that the condition of Delph's cervical spine did not improve, but the ALJ's decision indicates that the herniation was considered. The decision contains references to Dr. Pait's medical records, and those records are not extensive as Delph saw him on only a few occasions. Our role on review is limited to determining whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *See Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998). Despite evidence of a change in Delph's cervical spine, the record as a whole contains substantial evidence in support of the ALJ's decision that Delph's condition improved.

Delph appears to contend that the ALJ ignored some significant nonexertional impairments that affect his residual functional capacity. He does not elaborate on this issue or explain what impairments he is referring to, but he cites to the law requiring vocational expert testimony to establish there are jobs available for a person with the claimant's particular characteristics, including nonexertional limitations. *See, e.g., Sanders v. Sullivan*, 983 F.2d 822, 823 (8th Cir. 1992). The ALJ in this case specifically addressed Delph's nonexertional limitations and determined that they do

not limit his ability to perform basic work activities. Dr. McDonald listed an assortment of disorders after his psychological evaluation of Delph in June 1995. Since that time, Delph has undergone a number of mental health evaluations and his mental health records have been reviewed by specialists. The recent records show no significant psychological or psychiatric problems. The ALJ acknowledged that Delph suffers from depression. The ALJ found, however, that the evidence does not reveal any significant restrictions on Delph's activities as a result of the depression. Delph points to no record evidence to the contrary. The ALJ's findings are supported by substantial evidence.

### III

The judgment of the district court is affirmed.

———————————————————