**Raymond Charles SAVAGE, Plaintiff,**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**No. 4:14–cv–109 RP–RAW.**

United States District Court, S.D. Iowa, Central Division.

Signed Sept. 3, 2014.

Mary C. Luxa, U.S. Attorney's Office, Des Moines, IA for Defendant.

Thomas A. Krause, Schott Mauss & Associates, Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Raymond Charles Savage, filed a Complaint in this Court on March 20, 2014, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed applications for benefits December 9, 2010. Tr. at 129–30 & 136–42. Plaintiff, whose date of birth is November 29, 1964, (Tr. at 129) was nearly 48 years old at the time of the hearing on September 10, 2012, before Administrative Law Judge Tela Gatewood (ALJ). Tr. at 31–65. The ALJ issued a Notice Of Decision—Unfavorable on February 12, 2013. Tr. at 8–26. The Appeals Council declined to review the ALJ's decision on January 31, 2014. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

The ALJ found that Plaintiff was last insured for Title II benefits on December 31, 2011. At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity after December 9, 2010, the alleged disability onset date. At the second step, the ALJ found Plaintiff has the following severe impairments: migraine headaches, hypertension, obesity, chronic obstructive pulmonary (COPD), and a fatty liver. Tr. at 14. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 16. At the fourth step, that ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and/or carry and push and/or pull twenty pounds occasionally and ten pounds frequently. He can stand and/or walk with normal breaks for six hours in a workday. He can sit with normal breaks for six hours in a workday. The claimant could stoop, kneel, crouch, and climb ramps or stairs occasionally. The claimant cannot crawl or climb ladders, ropes or scaffolds. The claimant cannot work at unprotected heights or around hazards. The claimant would need to avoid concentrated exposure to dusts, fumes, smoke, chemicals, gases, or noxious odors.

Tr. at 18. The ALJ found that Plaintiff is unable to perform his past relevant work. Tr. at 23. At the fifth step, the ALJ found that Plaintiff is able to do a significant number of jobs, examples of which include marker, mail clerk, and photocopy machine operator. Tr. at 24–25. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 26.

## MEDICAL EVIDENCE

Before the alleged onset of disability date, Plaintiff was treated at Broadlawns Medical Center for various illnesses and

injuries, including migraine headaches which were described by a physician on August 14, 2009 (Tr. at 356), as refractory[1] and frequent. He was also treated for injuries sustained in a car accident, abdominal pain, and an umbilical hernia repair. The Court has reviewed all of those medical records but no purpose would be served by a detailed summary of them here.

On December 2, 2010, Plaintiff saw Randy N. Maigaard, M.D., at Broadlawns Medical Center for various complaints. Plaintiff said he continued to have migraine headaches which he treated with prescription medication. Plaintiff said he felt better on Lisinopril which was used to treat his high blood pressure. Plaintiff continued to have pain in his right shoulder. Plaintiff was advised to quit smoking. Plaintiff's prescriptions were refilled and he was advised to return to the clinic in three months. Tr. at 333–34.

On January 10, 2011, Plaintiff was seen in the neurology clinic at Broadlawns Medical Center for his migraine headaches. Plaintiff reported that the headaches were occurring 3 to 4 times per week, and once or twice per week the headaches were

accompanied by nauseousness, vomiting, and photophobia. Plaintiff said the headaches could last from four hours to three days. Tr. at 381. After the neurological examination, Wendy A. Waldman, M.D., made several changes in Plaintiff's medication. Tr. at 382.

Plaintiff saw Dr. Waldman again on February 16, 2011. Plaintiff continued to struggle with headaches. Plaintiff said prednisone, which the doctor prescribed at the previous visit, helped a little. Plaintiff had used the medication topiramate as prescribed, but had not noticed any changes. Plaintiff also reported having joint pain. Dr. Waldman increased the dosage of Topamax and added gabapentin[2] to help both headaches and joint pain. Tr. at 407.

On March 9, 2011, Plaintiff saw Dr. Waldman while he was having a migraine the intensity of which he rated at 9 on a scale of 1–10. Plaintiff said the headache had been nonstop for the past four days. The doctor wrote: "Unfortunately, he was denied Disability." The doctor increased the dosage of gabapentin. The doctor also prescribed Namenda[3] which she said was

---

1. resistant to treatment. Stedman's Medical Dictionary, 27th Edition.

2. Gabapentin (brand name Neurontin) is used to help control certain types of seizures. Gabapentin is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). Gabapentin is used to treat restless legs syndrome. Side effects of the medication include: drowsiness, tiredness or weakness, dizziness, headache, uncontrollable shaking of a part of the body, double or blurred vision, unsteadiness, anxiety, memory problems, strange or unusual thoughts, unwanted eye movements, nausea, vomiting, heartburn, diarrhea, dry mouth, constipation, increased appetite, weight gain, swelling of the hands, feet, ankles, or lower legs back or joint pain,

fever, runny nose, sneezing, cough, sore throat, or flu-like symptoms, ear pain red, itchy eyes (sometimes with swelling or discharge). MedlinePlus, A service of the U.S. National Library of Medicine, National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

3. Namenda (Memantine hydrochloride) is in a class of medications called NMDA receptor antagonists. It works by decreasing abnormal activity in the brain. Memantine may improve the ability to think and remember or may slow the loss of these abilities in people who have Alzheimer's disease. MedlinePlus, A service of the U.S. National Library of Medicine, National Institutes of Health. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604006.html

"an off-label approach to headache." Tr. at 404.

On March 30, 2011, Dr. Waldman noted that Plaintiff was having a particularly bad day and that he was extremely uncomfortable and had been for three days. Plaintiff had been unable to sleep. The doctor adjusted the dosage of Plaintiff's medication and added Ambien which she said was to aid sleep. Tr. at 403.

Plaintiff saw Dr. Waldman on May 2, 2011. He reported "three to four stints of bad headaches" since the previous visit. Plaintiff was having a headache which he rated at a level 8. The doctor adjusted Plaintiff's medications and wrote that she would ask for an opinion from the University of Iowa. Tr. at 402.

On May 9, 2011, Plaintiff saw Dr. Waldman after undergoing an MRI (Tr. at 411) which was normal with no changes since the MRI on August 19, 2009. Plaintiff reported daily headaches at a level 8. The doctor wrote that Plaintiff "continues to appear to be debilitated by headache." The doctor noted that an appointment at the University of Iowa was pending. Tr. at 401.

On June 13, 2011, Plaintiff reported that since beginning Namenda, his memory had improved somewhat. Plaintiff attributed his memory trouble to anxiety or to the headaches. The doctor noted that headaches can cause "quite a bit of anxiety." Plaintiff also thought the Gabapentin had helped a little. Tr. at 436.

Plaintiff underwent an MRI on August 12, 2011 which was normal. Tr. at 460. Thereafter, Plaintiff was seen in the emergency room because the MRI had aggravated a migraine headache. Tr. at 454. Chance Coppola, D.O., offered Plaintiff an injection, but he refused, saying "nothing ever works." Tr. at 455. Plaintiff left the hospital without completing treatment. Tr. at 456.

On September 8, 2011, Plaintiff saw Dr. Waldman. Plaintiff rated his headache pain, which had been present for several days, at a level 9. The doctor noted that no medication had provided relief. The doctor suggested a trial of Botox which Plaintiff was willing to try. The doctor wrote that if Plaintiff did not have a response to Botox, he would need to go to the University of Iowa or to a pain specialist. Tr. at 452.

On November 28, 2011, Plaintiff reported to Dr. Waldman that the Botox "did not help and, in fact, it made things generally worse." The doctor wrote: "For the last several months, he has been walking with a cane. He has constant headache. Actually starting to wonder if there may be a functional aspect here." When the doctor recommended that Plaintiff see someone at the University of Iowa, he was willing. Dr. Waldman wrote that she would be sure that all the medical records were available to the doctors at the University. Tr. at 451.

On April 3, 2012, Plaintiff was seen at the Broadlawns Medical Center Foot and Ankle Clinic. Tr. at 447–50. Plaintiff said that he had an adverse reaction to the Botox and was "experiencing pain just about everywhere." Denise M. Mandi, DPM, wrote that she reviewed Dr. Waldman's notes which indicated that the Botox was ineffective, but did not mention anything about an adverse reaction. Plaintiff had been to the University of Iowa Neurology Department but was immediately referred back to Broadlawns. Plaintiff was walking with a cane and said that he was using the cane before the Botox injections. Tr. at 447. After an examination (Tr. at 448) and x-rays (Tr. at 459), Plaintiff was assured that there were no fractures or signs of degenerative changes in

his left ankle. He was also assured that if the Botox injections caused a reaction it would be localized at the site of the injection. Tr. at 449.

On April 19, 2012, Plaintiff saw Paul S. Boeke, M.D. at the Broadlawns Neurology clinic. Plaintiff reported having nearly continuous headaches. He also complained of an inability to sleep. He reported being diagnosed with sleep apnea "but does not use his CPAP because he is a light sleeper." Plaintiff said that he was told at the University of Iowa that he was getting appropriate care at Broadlawns Medical Center. Tr. at 443. On review of symptoms, Plaintiff reported joint pain. On physical examination, Plaintiff's extremities were non-tender with a normal range of motion. On neurological examination, the doctor noted "out of proportion light sensitivity." All other notations on physical and neurological examination were listed as intact or normal. The doctor added new medications—Promethazine, Ondansetron, and Temazepam—and discontinued Nexium, Relafen, Zolpidem Tartrate, and Lidocaine. Tr. at 444.

On May 31, 2012, Plaintiff told Dr. Waldman that he had been to the University of Iowa but the doctors there were unable to help him. Plaintiff said that he didn't think the Gabapentin was helping, so the doctor discontinued it. Tr. at 439. The doctor prescribed Topamax and changed the dosage of two other medications. The doctor also recommended counseling where Plaintiff could consider biofeedback or cognitive behavioral therapy. Diagnoses were chronic headache and depression. Tr. at 440.

### ADMINISTRATIVE HEARING

Plaintiff appeared at a hearing on September 10, 2012. Tr. at 31–65. Plaintiff testified that he left his previous employment as a bindery worker and as a landscape worker because of his migraine headaches and his inability to tolerate heat. Tr. at 36–37.

Plaintiff testified that while he had migraine headaches for the previous twenty years, they had been getting worse for four or five years. He said that he wakes up with a headache every day. Tr. at 43. Plaintiff explained that about ten to twelve times per month, he will have a headache which lasts as long as three days. Tr. at 44. Plaintiff said that he's had headaches which last for an entire month. Tr. at 45.

Plaintiff testified that his headaches were aggravated by repetitive noise and by fluorescent lights. He also said that smells, such as the smell of carpeting will aggravate the headache. Tr. at 47.

Plaintiff said that his medication causes nausea, dizziness and fatigue. He said that he becomes lightheaded and has fallen "more than a couple times." Tr. at 48–49. Plaintiff said he uses a cane when he walks or stands because of the dizziness. Tr. at 51. Plaintiff said that the headaches cause problems with his memory and cause him to be irritable. Tr. at 49.

When asked about his need to lie down during the day, Plaintiff said that the migraine headaches wake him up at night which makes him sleepy during the day and that he finds himself lying down four or five hours during the day. Tr. at 50.

Plaintiff testified that his COPD causes him to be short of breath. Tr. at 52. He said that because of the effects of the hernia surgeries, he still has stomach pain and has trouble with physical activities such as lifting and carrying as well as bending, stooping. Tr. at 53.

Plaintiff testified that he was five feet, eight inches tall, and that he weighed 280 or 300 pounds. Tr. at 57.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 60. The ALJ asked the following hypothetical question:

I would like you to presume an individual of the same age, education, and work experience as the claimant; presume that the individual could lift and/or carry, push and/or pull 20 pounds occasionally, and 10 pounds frequently; presume that the individual could stand and/or walk with normal breaks for six hours in a workday; presume that the individual could sit with normal breaks for six hours in a workday; presume that the individual could stoop, kneel, crouch, climb ramps or stairs occasionally. The individual cannot climb ladders, ropes, or scaffolds, cannot crawl. The individual cannot work at unprotected heights or around hazards. The individual would need to avoid concentrated exposure to dust, fumes, smoke, chemicals, gasses or noxious odors. With that—those limitations would that allow for any of the past occupations?

Tr. at 61–62. In response, the vocational expert testified that Plaintiff's past job of weight clerk, as it is described in the Dictionary of Occupational Titles, could be performed. The vocational expert went on to say, however, that the job could not be done as Plaintiff performed it because his exposure to hazards, dust and fumes. Finally, the vocational expert said that Plaintiff was required to lift heavier weight than the hypothetical allowed. The vocational expert cited unskilled jobs such as marker, unskilled mail clerk, and photocopy machine operator all of which could be performed given the restrictions in the hypothetical question. The vocational expert said the unskilled jobs could still be performed if the need to avoid excess noise were added to the restrictions. Tr. at 62. The vocational expert said that the need to avoid extremes of temperature or high humidity would have no effect on the ability to do the unskilled jobs. Tr. at 62–63. The vocational expert also testified that the unskilled jobs could still be performed if the hypothetical individual were unable to work with the public.

In response to questions from Plaintiff's attorney, the vocational expert testified that absenteeism of at least two days per month would not be tolerated in competitive employment. Tr. at 63. The vocational expert also testified that the need to take unscheduled breaks would preclude competitive employment. Tr. at 63–64.

## ALJ's DECISION

In her decision, the ALJ wrote that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that his statements regarding the intensity, persistence and limiting effects were not entirely credible. The ALJ noted that Plaintiff reported having headaches for twenty years, but that he had been able to work for a number of years. The ALJ noted that Plaintiff had only occasionally reported headaches to doctors until he applied for disability benefits. The ALJ noted the doctor's statement that there may be a functional aspect to the headaches. Tr. at 19. The ALJ noted Plaintiff's use of a cane despite the doctor's statement that the only thing displayed by Plaintiff was slow walking. The ALJ noted Plaintiff's failure to quit smoking, exercise or lose weight. The ALJ wrote: "Generally, individuals with disabling impairments seek medical assistance and follow medical advice in order to obtain some relief from the alleged significant symptoms. The claimant appears to have little motivation to return to work or to improve his situation."

Turning to the medical evidence, the ALJ noted benign findings on diagnostic

testing, including three unremarkable brain scans. The ALJ wrote that Dr. Waldman's neurological examinations failed to reveal abnormal findings. Tr. at 20. The ALJ wrote that Plaintiff's migraine headaches were accounted for in the restrictions contained in the residual functional capacity finding. Tr. at 21.

In her decision, the ALJ considered whether or not any of Plaintiff's impairments met the requirements of any of the listed impairments so as to qualify for benefits at step 3 of the sequential evaluation. Tr. at 16–18. The ALJ wrote that she considered sections 3.02, 3.03, 5.05 as well as the listings for respiratory, digestive, neurological and cardiovascular systems. Furthermore, the ALJ wrote that she considered Social Security Ruling (SSR) 02–1p which instructs ALJ's on the evaluation of obesity. The ALJ found that Plaintiff did not meet the requirements of any of the sections of the listings which she consulted, including the listings for mental impairments. Tr. at 16–18.

In determining Plaintiff's residual functional capacity, the ALJ wrote that she took into account migraine headaches, hypertension, obesity, chronic obstructive pulmonary disease and fatty liver. The ALJ wrote: "... the objective medical evidence does not provide a basis for finding limitations greater than those determined in this decision." The ALJ noted Plaintiff's daily activities of caring for a dog, performing light cleaning, ability to use public transportation, preparation of light meals, and shopping. Tr. at 22.

The ALJ wrote that she gave "significant weight" to the opinions of the doctors at the state agency who reviewed the records at the initial and reconsideration stages of the claim adjudication. Tr. at 23. The state agency doctor, Jan Hunter, D.O., on February 25, 2011, opined that there were no exertional limitations established by the record. Tr. at 389.

## DISCUSSION

 We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola [v. Astrue]*, 480 F.3d [885], at 886 [ (8th Cir.2007) ] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In *Brand v. Secretary of Dept. of Health, Education and Welfare*, 623 F.2d 523, 527 (8th Cir.1980), Chief Judge Lay wrote that *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review." In *Universal Camera*, the Court wrote:

We conclude, therefore, that the Administrative Procedure Act and the Taft–

Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Id.*, 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987).

In *Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir.1989), the Court described its duty as follows:

The district court delineated its standard of review by stating that the Secretary's decision is conclusive if supported by substantial evidence. Such a broad-based search of the record for evidence supporting the Secretary's findings is inappropriate when reviewing an admin-

istrative decision. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (citations omitted). Rather the district court's review should be based on whether substantial evidence on the record as a whole supports the Secretary's decision. A notable difference exists between "substantial evidence" and "substantial evidence on the record as a whole":

"Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (citations omitted).

██ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

In his brief, Plaintiff argues that the ALJ erred in requiring unspecified objective evidence of migraine headaches when there are no diagnostic or laboratory tests that can confirm the presence of migraines. Plaintiff argues that the migraine headaches are medically equivalent to the listing of impairments 11.03 nonconvulsive epilepsy. Plaintiff argues that the ALJ's decision is not supported by substantial medical evidence and that the ALJ failed to fully and fairly develop the record by obtaining work-related limitations from a treating or examining source.

Plaintiff urges the Court to reverse and remand for a calculation of benefits.

■ Plaintiff cites POMS (Program Operations Manual System) DI 24505.015 to support his argument that he medically equals a listed impairment. The Commissioner makes an equally compelling argument that the listing is not equaled. To the extent that the ALJ considered whether or not Plaintiff meets or equals a listed impairment, the most that the Court can say, given the record that was made before the ALJ, is that the ALJ's holding on this point falls within the zone of reasonable choice and will not be disturbed.

Because the ALJ did not find Plaintiff disabled at step three of the sequential evaluation, the case proceeded to steps four and five. At step four, the ALJ determines if the claimant retains a residual functional capacity for work, and whether past relevant work can be performed. Because she determined that past relevant work was not possible, the ALJ proceeded to step five where it is determined whether other work exists for an individual with the same limitations in the residual functional capacity finding.

The critical finding here, and usually the most important issue in any disability case which proceeds beyond step three of the sequential evaluation is that of residual functional capacity:

> Probably the most important issue will be the question of [residual functional capacity].... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.

*McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc).

■ In this case, the Court finds no support in the medical evidence that Plaintiff is able to function in a competitive work environment. In fact, the treating neurologist wrote in a treatment note that Plaintiff was debilitated by his headaches, and another time that it was unfortunate that he was denied disability benefits. The ALJ should determine a claimant's residual functional capacity based on the relevant evidence, including medical records, observations of treating physicians, and the individual's own description of his limitations. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir.2004) citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir.2000). The ALJ may not draw her own inferences about Plaintiff's functional ability from medical reports. *Id.* citing *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir.2003). It is improper for an ALJ to rely on the opinions of reviewing physicians who have neither treated or examined the claimant. *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.2000). An ALJ may discount or disregard a treating physician's opinion "where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir.2000).

■ In the case at bar, the treating physician is the neurologist, Dr. Waldman. Although Dr. Waldman was not afforded the opportunity to render a formal medical opinion regarding Plaintiff's limitations, her treatment notes are clear. As Plaintiff points out in his brief, at least a dozen times Dr. Waldman saw him and observed him while he was suffering from migraine headaches. Never once did the doctor express doubt as to the intensity of the headaches. She always prescribed medication in an attempt to provide relief. The doc-

tor's treatment notes are neither inconsistent nor conclusory. Although Dr. Waldman once opined that there may be a functional aspect to Plaintiff's condition, she did not express doubt that he was having the headaches of which he complained, and she continued to prescribe medication and suggest treatment modalities to relieve Plaintiff's condition. It was error for the ALJ not to have afforded "special" if not "controlling" weight to the information contained in Dr. Waldman's treatment notes, namely her observation that the headaches are debilitating. Likewise, Dr. Waldman expressed dismay that Plaintiff had been denied disability benefits. In *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984), "The Court wrote that adjudicators must give full consideration to all the evidence presented including the observations of treating and examining physicians relating to such matters as, among other things, the duration, frequency and intensity of the pain." Dr. Waldman and other physicians who have treated him are clear that he suffers from refractory and frequent headaches.

█ In response to Plaintiff's argument that the ALJ failed to fully and fairly develop the record, the Commissioner argues that the ALJ met that obligation by relying on the opinions of the non-examining physicians at the State Agency. However, the Court of Appeals for the Eighth Circuit has, time and time again, held that the opinions of such physicians do not constitute substantial evidence supportive of a denial of benefits. *See, e.g. Landess v. Weinberger,* 490 F.2d 1187, 1189–90 (8th Cir.1974); *Nevland v. Apfel,* 204 F.3d at 858; *Dixon v. Barnhart,* 324 F.3d 997, 1002 (8th Cir.2003). Having canvassed the record of this case from beginning to end, the Court can find no evidence to contradict the opinion of Dr. Waldman that Plaintiff is debilitated by frequent and re-

fractory headaches. There is no substantial evidence which contradicts that provided by the treating sources at Broadlawns Medical Center.

█ The ALJ pointed to Plaintiff's daily activities of taking care of his dog, performing light cleaning, using public transportation preparing light meals, and shopping as evidence that he can work in substantial gainful activity. Again, the Court of Appeals has held numerous times that such intermittent activity shows nothing about the claimant's ability to work. *Forehand v. Barnhart,* 364 F.3d 984, 988 (8th Cir.2004), *citing Brosnahan v. Barnhart,* 336 F.3d 671, 677 (8th Cir. 2003); *McCoy v. Schweiker,* 683 F.2d at 1147; *Wilcutts v. Apfel,* 143 F.3d 1134, 1137 (8th Cir.1998). The *Forehand* Court noted that this case law is consistent with 20 C.F.R. § 404.1545. The ALJ's observation that Plaintiff does not appear to "seek medical assistance and follow medical advice in order to obtain some relief", ignores the numerous times Plaintiff sought medical care from his treating physicians. Although the treatment notes do not appear in the record before the Court, the physicians at Broadlawns Medical Center commented that Plaintiff followed their advice to consult with physicians at the University of Iowa Hospitals and Clinics. At the University, he was told he was receiving appropriate medical care in Des Moines.

The ALJ wrote: "[Plaintiff] alleged migraine headaches only occasionally to doctors before the date of the filing of the application." Tr. at 19. In the first place, the Broadlawns treatment record dated December 12, 2010 (Tr. at 333) states that Plaintiff was seeing a physician at Mercy Hospital Medical Center for headaches and was using several prescription medicines. There does not appear to have been any effort to obtain those treatment rec-

ords during the administrative process. In addition, an examination of Plaintiff's earnings record (Tr. at 157–58) shows steady earnings between the years 1985 and 2005, with a high of $31,157 in 2001. Plaintiff's earnings in 2006 were approximately half of what they were in 2005, and no earnings reported in 2007 or thereafter. This is substantial evidence in support of his testimony that his headaches gradually became worse until finally in 2006, he was unable to work any longer. In *Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir.1984), the Court held that a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.

▆▆ In *McCoy v. Schweiker*, 683 F.2d at 1148, the Court wrote that assessments of residual functional capacity must take into account the effects of nonexertional impairments such as pain, mental, sensory or skin impairments. Quoting *Gagnon v. Secretary of Health and Human Services*, 666 F.2d 662, 666 n. 8 (1st Cir.1981), The *McCoy* Court wrote

> Pain may be a nonexertional factor to be considered in combination with exertional limitations as well as a separate and independent ground for disability. *Where pain is considered as a separate ground for disability, of course, it must be severe enough to prevent the claimant from engaging in any substantial gainful employment.* Where pain is considered in combination with exertional limitations, however, it need only be found significant enough to prevent the claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies. (*emphasis added*)

▆▆ Here, the ALJ found Plaintiff's severe impairments to be migraine headaches, hypertension, obesity, chronic obstructive pulmonary disease (COPD), and a fatty liver. In the opinion of the Court these impairments are nonexertional in nature. That is to say, they do not affect the ability to lift, sit, stand, walk or other exertional activities. All of the limitations in the ALJ's residual functional capacity finding, however, are exertional in nature with the exception of the need to avoid concentrated exposure to dusts, fumes, smoke, chemicals, gases, or noxious odors. The medical evidence establishes that Plaintiff suffers from frequent refractory headaches. Plaintiff seeks medical treatment for these headaches on a regular basis and is prescribed medication which is not always successful in controlling the pain. Several times the treating neurologist wrote that Plaintiff's headaches occur 3 to 4 times per week and were often accompanied by nauseousness, vomiting and phobophobia. Plaintiff testified that the headaches also cause fatigue as well as excruciating pain. These nonexertional consequences of the severe impairments must be considered when determining whether a claimant can work. In *Ness v. Sullivan*, 904 F.2d 432, 436 (8th Cir.1990), it was noted that the Circuit has repeatedly held that "vocational testimony elicited by hypothetical questions that fail to relate with precision the physical and mental impairments of the claimant cannot constitute substantial evidence to support the [Commissioner's] decision."

The vocational expert testified that absences from work of even two days per month were enough to preclude work activity. The vocational expert also testified that the need for frequent breaks during the work day would preclude competitive work activity. In *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir.1995), the Court wrote: "For a claimant to qualify for work at any level, that claimant must have the ability to perform the tasks of employment on a daily basis."

When the record of this case is viewed as a whole, there is no substantial evidence to support a finding that Plaintiff has the residual functional capacity to perform any substantial gainful activity "... day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." In the opinion of the Court, Plaintiff proved his case with medical evidence and is entitled to the benefits for which he applied.

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in *Gavin v. Heckler*, 811 F.2d at 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and is based on legal error. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[4]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

[4]. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."